IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **MARLO E. BREDING**, | Civil Case No. 08-6348-KI |
| Plaintiff, | |
| | OPINION AND ORDER |
| vs. | |
| **MICHAEL J. ASTRUE,** Commissioner,<br>Social Security Administration, | |
| Defendant. | |

    Kathryn Tassinari
    Robert A. Baron
    Harder Wells Baron & Manning, PC
    474 Willamette Street, Suite 200
    Eugene , OR 97401

        Attorneys for Plaintiff

    Kent S. Robinson
    Acting United States Attorney
    District of Oregon

Page 1 - OPINION AND ORDER

Adrian L. Brown
U.S. Attorney's Office
1000 SW Third Avenue, Suite 600
Portland , OR 97204

David J. Burdett
Michael S. Howard
Willy M. Le
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington  98104-7075

       Attorneys for Defendant

KING, Judge:

Plaintiff Marlo Breding brings this action pursuant to section 405(g) of the Social Security Act (the "Act") to obtain judicial review of a final decision of the Commissioner denying his application for disability insurance benefits ("DIB").  I reverse and remand the decision for a finding of disability.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months.  42 U.S.C.

§§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920. First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the

impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work which he or she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his or her age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he or she is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). Substantial evidence is more than a "mere scintilla" of the evidence but less than a preponderance. Id. "[T]he commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision." Batson v. Barnhart, 359 F.3d 1190, 1193 (9th Cir. 2003) (internal citations omitted).

## THE ALJ'S DECISION

The ALJ found that Breding had severe impairments of "degenerative disc disease/spondylolysis of the lumbar spine, mild degenerative disc disease of the cervical spine, and a history of polysubstance abuse reportedly in long-term remission with current

opiate/cannabis dependence and probable alcohol abuse." Tr. 18. The ALJ also found that these impairments, either singly or in combination, were not severe enough to meet or medically equal the requirements of any of the impairments listed in Appendix 1, Subpart P of the Social Security Regulations. After reviewing the medical record, the ALJ concluded that Breding could perform light work except he was limited to climbing, kneeling, crouching, and crawling on an occasional basis. The ALJ found that Breding could not perform his past relevant work, but had the residual functional capacity ("RFC") to work as a receptionist or a telephone solicitor, and was not disabled under the Act.

## FACTS

Breding, who was 56 years old at the time of the ALJ's decision, claims that he has been disabled since July 2, 2004, due to pain in his back and left hip, dysthymic disorder, and a personality disorder. Breding's physical pain in his back stems from a work-related injury in 1994. He re-injured his back on Christmas Eve of 2003. Breding completed high school, one year of college, and a number of certifications related to auto mechanics. He has worked as a master auto mechanic and a customer service representative.

Breding sees himself as a traditional, middle class, white, conservative Christian. He is very active in his church, which he attends three days per week. He considers his pastor and friends from church to be his emotional support system. Breding and his wife of twenty-five years have two adult biological children, and have adopted five foster children, ages four through thirteen, several of whom have special needs. Breding and his wife continue to act as temporary foster parents to infants occasionally. All of their monthly income stems from their role as adoptive parents and foster parents. Breding reports that his wife "does most of the work that is

Page 5 - OPINION AND ORDER

required to . . . make sure that [the] kids are cared for[.]" Tr. 620. Breding testified that his current role is to keep "them from killing each other during the day when they get home from school." Tr. 620.

Breding can drive for short periods of time, but often does not drive at all; he "feels too sedated and inattentive because of his pain medication." Tr. 505. He does no yard work, but is able to clean for up to 20 minutes at a time. He is able to grocery shop, but cannot do so for more than 30 minutes because he ceases to be able to stand. Breding reports that, due to his pain, he spends 6-7 hours per day in bed about 3 times per week, watching television with a heating pad. Roughly once a week, he does not get out of bed at all. He says he cannot sit in a chair for more than about 15 minutes without his legs becoming numb.

During 2002, while working in customer service at Symantec, Breding missed work about twice per month due to pain in his back. At the hearing, he testified that he could not do that type of work now, because it requires sitting and standing, and he would be too distracted by his hip pain, which feels like "sitting on a burning coal." Tr. 634. According to Breding, he needs to spend significant periods of time on his back because his "left hip always feels like it's on fire." Tr. 634. Breding reports he has sleeping difficulty daily, and that he "can stay up for several days due to the pain and end up exhausted." Tr. 555.

As a teenager and young man, Breding used alcohol and a number of drugs, including psilocybin mushrooms, LSD, methamphetamine, cocaine, and marijuana. According to Breding, he ceased all use of illicit substances on August 26, 1985, when he found God. Years later, Breding began consuming alcohol again only occasionally, because he "had a handle on his drinking." Tr. 543. After his back injury, his long-time primary care physician, Dr. William

Page 6 - OPINION AND ORDER

Moshofsky, prescribed Breding a number of pain killers, including hydrocodone and morphine. Breding uses the prescription opiates on a regular basis, and they cause him short-term memory loss. In 2006, after consulting with his doctor over a prolonged period, and after consulting with his pastor, Breding and Dr. Moshofsky agreed that Breding would begin using medical marijuana. Breding uses only small amounts of marijuana once per day, prior to bed, in order to allow him to go to sleep. He explained that "it's pleasurable to do but I, you know, I don't do it for pleasure." Tr. 653.

In January 2008, Dr. Moshofsky recorded that Breding's "wife has been having some problems with alcohol, so between him and family members she ended up going to a treatment program at Willamette Family Treatment Center ('Willamette'). [Breding] also had some reviews with them in helping his wife[.]" Tr. 576. Breding explained, regarding his own drug assessment at Willamette, that in order for them to help with the family intervention and provide his wife with treatment for her alcoholism, he was required to enter treatment as well. Tr. 652. Breding believes the assessors from Willamette may have observed signs of his narcotic usage, and believed he was abusing drugs as well. Marvin Barber, the assessment counselor at Willamette, made a clinical assessment that Breding "meets criteria [for] cannabis and opiates dependence." Tr. 547. He did not diagnose alcohol abuse. In the Willamette Discharge Summary, on January 4, 2008, Leonard Sytsma, a certified alcohol and drug counselor, wrote that Breding "is unable or unwilling to maintain abstinence from drugs and alcohol at this time." Tr. 536. Sytsma explained that Breding "reports chronic back problems/pain and his continued use [of opiates] will interfere with A&D treatment[.]" Tr. 536.

Page 7 - OPINION AND ORDER

Breding also has a prescription for Prozac for depression. Dr. Moshofsky noted in August 2007 that Breding's "wife and other friends state that they notice that he is acting more depressed." Tr. 579. In October 2007, in conjunction with his work as a foster parent for DHS, Breding was referred to psychologist Dr. David Truhn. Dr. Truhn conducted a Comprehensive Psychological Examination and diagnosed Breding with, among other things, dysthymic disorder.[1] On January 8, 2009, Dr. Moshofsky wrote in his treatment notes that Breding "is a patient with chronic pain and with depression." Tr. 576. Nicole Miller, a counselor at the Center for Family Development in Eugene, also noted Breding's psychiatric symptoms of "depression, inactivity, loss of interest, sleeping difficulty, and irritability" and separately diagnosed him with dysthymic disorder. Tr. 555. Breding analogized his depression to a fog he gets lost in.

## DISCUSSION

Breding argues the court should reverse the ALJ's decision for three reasons. According to Breding, the ALJ improperly rejected Dr. Truhn's diagnoses, rejected Breding's testimony, and credited the testimony of the vocational expert. I agree and address each point in turn.

I.  Examining Physician Testimony

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007). If a

---

[1] "The essential feature of Dysthymic Disorder is a chronically depressed mood that occurs for most of the day more days than not for at least 2 years." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 376 (4th ed. 2002) ("DSM-IV-TR").

Page 8 - OPINION AND ORDER

treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. Id. (treating physician); Widmark v. Barnhart, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. Orn, 495 F.3d at 632; Widmark, 454 F.3d at 1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. Widmark, 454 F.3d at 1066 n.2.

Here, the ALJ rejected the findings of Dr. Truhn, an examining psychologist, in favor of the findings of Dr. Henry, a nonexamining, nontestifying medical advisor. Dr. Truhn conducted a Comprehensive Psychological Evaluation of Breding. He diagnosed Breding with a pain disorder with both psychological factors and a general medical condition, and late onset dysthymic disorder. Dr. Truhn concluded that Breding's "prognosis is poor." Tr. 510. Dr. Henry agreed that Breding had a pain disorder, but disagreed that Breding had dysthymic disorder.

    A.    Dysthymic Disorder

Breding argues that the ALJ failed to give clear and convincing reasons for rejecting the diagnosis of dysthymic disorder by Dr. Truhn. Defendants argue that the ALJ provided specific and legitimate reasons, related to the opinion of the nontestifying, reviewing physician Dr. Henry, that were sufficient to reject Dr. Truhn's diagnosis. The correct standard to apply when a non-testifying state agency reviewing physician contradicts the opinion of an examining physician is "specific and legitimate." Widmark, 454 F.3d at 1066-67.

Page 9 - OPINION AND ORDER

Prior to my analysis of whether the ALJ offered specific and legitimate reasons, however, I find it germane to note there is no evidence that Dr. Truhn's psychological evaluation was, as the ALJ insinuated, one that "claimant's attorney request[ed] . . . through [his] contacts so the State of Oregon will appear as the requestor and pay for the examination." Tr. 21.  Rather, the record indicates that "Ms. Jan Norton, Department of Human Services, referred Mr. Breding for a psychological evaluation to aid in case planning." Tr. 503.  Case planning is necessary because Breding is a foster parent for the Oregon Department of Human Services ("DHS").

The ALJ gave three reasons for rejecting the diagnosis of dysthymic disorder.  First, the ALJ was persuaded by Dr. Henry that "although psychologist Truhn assessed a dysthymic disorder, the examining psychologist 'evidently did not observe evidence of depression as he described affect as appropriate' and 'all mental status behavioral observations were normal[.]'" Tr. 21.  In his response to Dr. Henry's mental summary, however, Dr. Truhn explained that "an individual that is reporting depression or other symptoms that identify a diagnosis of mental illness do not [sic] exhibit all of the symptoms and at times none of the symptoms in the course of a one day evaluation." Tr. 590.  Dr. Truhn's explanation is supported by the DSM-IV-TR, which does not require that a patient exhibit symptoms of depression at all times or during a psychological evaluation in order to diagnose dysthymic disorder.  Rather, the hallmark of the disorder is, again, "chronically depressed mood that occurs most of the day more days than not for at least 2 years." DSM-IV-TR at 376.  The DSM-IV-TR also specifies that in order to be diagnosed as dysthymic disorder, "symptom-free intervals last no longer than 2 months." Id. at 377.

Second, the ALJ cited 20 C.F.R. §§ 404.1508 and 416.908 for the proposition that diagnoses in the medical record that are based solely on the claimant's reported symptoms cannot be found to show the existence of an impairment. I need not reach whether the statutes support such a proposition in the context of mental health diagnoses because Dr. Truhn gave Breding a Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") test, among others, and noted "there was evidence of depression and lethargy noted in the MMPI-2 interpretation." Tr. 590.

Third, the ALJ accorded "[g]reater weight . . . to the conclusions reached by psychologist Henry, who has had a longitudinal medical record to review and who provided solid support for his conclusion, than to the less-well-supported conclusions of psychologist Truhn, who examined the claimant on a single occasion." Tr. 22. This rationale is undercut by the fact that Dr. Truhn also reviewed nine years worth of medical records. The ALJ's larger conclusion that the record does not support a finding of dysthymic disorder is also undercut by the entirely separate diagnosis of dysthymic disorder by Breding's counselor Ms. Miller and the opinion and notes of depression by Dr. Moshofsky.

In conclusion, I hold that the ALJ failed to give specific and legitimate reasons for rejecting Dr. Truhn's diagnosis of dysthymic disorder.

II.     Breding's Testimony

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the

Page 11 - OPINION AND ORDER

severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. If there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony "only by offering specific, clear and convincing reasons for doing so." Id.

Although the ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence, medical evidence is still a relevant factor in determining the severity of the pain and its disabling effects. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

> In order to find [the claimant's] testimony regarding the severity of his pain and impairments unreliable, the ALJ was required to make "a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002). . . . The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (some internal citations omitted).

Here, the ALJ takes issue with Breding's testimony about the extent of his back and hip pain, and its consequent limitations. The ALJ questions the sufficiency of the objective evidence and finds that Breding is not credible. I disagree.

      A.      <u>Objective Evidence</u>

The record contains objective medical evidence of impairments which could reasonably be expected to produce some degree of back pain. Although Breding's financial condition precluded him from conducting extensive imaging studies, he did undergo an MRI in 2004. The MRI "noted narrowing of the L5-S1 disk space." Tr. 488. It also "show[ed] focal L2-L3 disc degeneration with dessication and anterior disc prolapse. Discogenic vertebral sclerosis also present." Tr. 340. A physical examination by neurologist Dr. Kathleen Wilken in 2007 revealed "significant . . . loss of normal lumbar lordosis." Tr. 489. In addition to the cervical spondylosis that the ALJ found was a severe impairment in Breding's upper back, Dr. Wilken's physical examination confirmed "[c]hronic low back pain with continuing difficulties with intermittent S1 irritation" at the bottom of the spine. Tr. 490.

The ALJ found that Breding's "allegations are extremely disproportionate to the objective findings in the medical record." Tr. 26. Although the objective medical evidence may not show that Breding's impairments could reasonably be expected to cause the severity of back and hip pain he reports, such is not the relevant standard. The objective medical evidence of Breding's back conditions show that they could reasonably have caused *some degree* of back and hip pain. This degree of evidence is sufficient for the first stage of the two-stage credibility analysis.

      B.      <u>Claimant's Credibility</u>

The ALJ's assessment that Breding is not wholly credible primarily turns on his mistaken conclusion that Breding "has a history of polysubstance abuse, which suggests patterns of duplicity/evasion/misdirection." Tr. 26. The ALJ also indicates Breding's daily functioning is not commensurate with the limitations he reports.

Page 13 - OPINION AND ORDER

According to the ALJ, Breding is currently an alcoholic and he misrepresented his alcohol usage to Dr. Truhn. He notes that Breding told Dr. Truhn that "he last used alcohol twenty-one years prior to the examination." Tr. 23. The ALJ found this statement contrary to Breding's treatment for alcoholism in 2007 at Willamette. The ALJ concluded that because Breding "clearly lied . . . [t]his means that all of the claimant's statements to Dr. Truhn are suspect." Tr. 23.

Yet the record does not support a finding that Breding is an alcoholic or that he was treated for alcoholism. As explained above, Breding was required to do an intake at Willamette as a condition of the center offering alcoholism treatment to his wife. The clinical formulation of his intake assessment at Willamette found that he "meets criteria cannabis and opiates dependence [*sic*]." Tr. 547. No problems with alcohol were reported. The Willamette discharge summary acknowledged that Breding's unwillingness to abstain from prescribed cannabis and opiates stemmed from the substances' usefulness in treating his pain. Although the Willamette records sometimes use the phrases "alcohol and drugs" or "A&D," it is clear these words are boilerplate. There is no evidence in the record to support the contention that Breding is an alcoholic or that he lied about alcoholism to anyone.

The ALJ's determination that Breding is not wholly credible because "the overall evidence of record indicates that the claimant is self-imposing [his] limitations," is equally unwarranted. According to the ALJ, since Breding helps care for his children, he is able to do light work and is not totally disabled. The record indicates, however, that Breding helps cares for his children in limited ways. His primary role is only to prevent conflict during the brief period

between the children's arrival from school and his spouse's arrival from the university. The ALJ acknowledged that at their age, the children "do not require much supervision." Tr. 24.

The ALJ's conclusions are not supported by the record. Accordingly, I find that the ALJ did not give clear and convincing reasons to reject Breding's subjective testimony about his condition.

III.     Vocational Expert Testimony

The vocational expert's testimony is of no evidentiary value because the ALJ's hypothetical question did not include all of Breding's limitations. Hypothetical questions posed to a vocational expert must specify all of the limitations and restrictions of the claimant. Edlund v. Massanari, 253 F.3d 1152, 1160 (9th Cir. 2001). If the hypothetical does not contain all of the claimant's limitations, the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy. Id.

In this case, the ALJ told the vocational expert that Breding could walk for no more than six hours in an eight hour workday, or sit for no more than the same period. He also told the vocational expert that the hypothetical person could occasionally climb, stoop, kneel, crouch, and crawl. With regard to non-exertional limitations, such as mental functioning, the ALJ instructed the vocational expert that "there's no indication of impact on limitations on work." Tr. 660. Based on the hypothetical, the vocational expert testified that someone with the specified limitations could work as a receptionist or a telephone solicitor.

The hypothetical posed to the vocational expert, however, omits both mental and physical limitations present in Breding. At best, Breding's mental limitations include memory problems from his medication regimen and dysthymic disorder. Dr. Truhn noted that Breding "has a

Page 15 - OPINION AND ORDER

weakness in short term memory" corroborated by objective testing. Tr. 509. Breding testified at his hearing that "I'll be talking and I'll have to ask my wife, what were we just talking about... it just goes, gone." Tr. 657. The ALJ acknowledged that Breding's medication had made his hobby of video editing difficult, and that Breding's "functioning would improve if he were to cease all use of addictive substances." Tr. 26.

On cross examination, the vocational expert acknowledged that Breding's memory problems, together with the dysthymic disorder and his physical limitations would "really [inaudible] question the receptionist job" and generally preclude Breding from "performing any kind of gainful employment." Tr. 674-75.

The ALJ failed to include a limitation in the hypothetical that the person would have limited ability to remember detailed instructions and would be depressed. Yet these limitations are supported by substantial evidence in the record. More is not required. Without reaching the accuracy of the physical limitations in the ALJ's hypothetical, I hold that the absence of mental limitations in the hypothetical renders the vocational expert's testimony without evidentiary value.

IV.     Remedy

The court has the discretion to remand a case for additional evidence and findings or to award benefits. McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). The court should credit evidence and immediately award benefits if the ALJ failed to provide legally sufficient reasons for rejecting the evidence, there are no issues to be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence is credited. Id. If this test is satisfied,

remand for payment of benefits is warranted regardless of whether the ALJ might have articulated a justification for rejecting the evidence. Harman v. Apfel, 211 F.3d 1172, 1178-79 (9th Cir.), cert. denied, 531 U.S. 1038 (2000).

In this case, the ALJ failed to provide specific and legitimate reasons to reject the opinion of Dr. Truhn about Breding's dysthymic disorder. Moreover, the ALJ failed to offer specific, clear and convincing reasons to reject Breding's subjective symptom testimony. Finally, the ALJ improperly credited the vocational expert's testimony, which, without an accurate hypothetical, has no evidentiary value. If Breding's testimony about his symptoms and Dr. Truhn's diagnoses were credited, the ALJ would have been required to find Breding disabled. Indeed, it is clear from the record that Breding is not able to perform work in the national economy due to his conditions.

## CONCLUSION

Based on the record, the decision of the Commissioner is reversed. The case is remanded for a finding of disability.

IT IS SO ORDERED.

Dated this        16th          day of December, 2009.

                                             /s/ Garr M. King
                                             Garr M. King
                                             United States District Judge